# UNITED STATES BANKRUPTCY COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

In re:

VIJAY K. TANEJA,

     Debtor.

H. JASON GOLD, LIQUIDATING TRUSTEE,

     Plaintiff,

vs.

FIRST TENNESSEE BANK, NATIONAL
ASSOCIATION,

     Defendant.

Case No.   08-13293-RGM
(Chapter 11)

Adv. Proc. No. 10-1225

## MEMORANDUM OPINION

This case concerns a significant fraud perpetrated by a mortgage broker against a bank and the trustee's attempt to recover payments made by the mortgage broker to the bank as fraudulent conveyances.[1]

Financial Mortgage, Inc., which is known as FMI and was owned and controlled by Vijay K. Taneja, was a mortgage broker that originated home mortgages. It perpetrated a significant fraud on institutional warehouse lenders and secondary mortgage purchasers by creating fraudulent loans. Each fraudulent loan was funded on an interim basis by an advance on a line of credit provided by

---

[1]Vijay K. Taneja and four corporations he owned or controlled, Financial Mortgage, Inc., Elite Entertainment, Inc., NRM Investments, Inc., and Taneja Center, Inc., filed voluntary petitions under chapter 11 of the United States Bankruptcy Code on June 9, 2008. H. Jason Gold was appointed the chapter 11 trustee for all five estates and the cases were jointly administered. The Official Committee of Unsecured Creditors and the trustee proposed a joint plan of liquidation which was confirmed on August 10, 2011. Mr. Gold was appointed the Liquidating Trustee.

a warehouse lender until a secondary mortgage purchaser bought the loan and paid off the advance. FMI would then make the regular monthly payments on the fraudulent loan. In normal times, the advance on the warehouse lender's line of credit would be outstanding for a brief period, perhaps a week to ten days. The warehouse lenders generally required the loans to be sold to secondary mortgage purchasers or repurchased by FMI within 60 to 90 days.

The fraud worked reasonably well – from Taneja's point of view – in normal economic times. FMI forged the necessary documents to obtain an advance from a warehouse lender's line of credit. A secondary mortgage purchaser bought the fraudulent loan and repaid the warehouse lender's advance. FMI had the monthly mortgage statements for the fake loan mailed to it and made the regular monthly payments. The fraud ended principally because of extraordinary market conditions resulting from the bursting of the real estate bubble.[2] Secondary mortgage purchasers increasingly tightened lending standards and reduced or stopped purchasing mortgage loans, particularly subprime mortgages. The secondary market for mortgages nearly collapsed. Tr. 3/1/2012 at 22-23. When the fraudulent scheme came to an end, FMI's warehouse lenders had fraudulent loans outstanding on their lines of credit. They had funded the fraudulent loans, but secondary mortgage purchasers had not purchased them. FMI satisfied some of the outstanding obligations to warehouse lenders from various sources – apparently not all legitimate – but many were never paid. Taneja, the mastermind of the fraud and the owner of FMI, pled guilty to money laundering and is presently in prison.

---

[2]Robert A. Garrett, Executive Vice President of Mortgage Warehouse Lending at First Tennessee Bank, testified that:

> On the last Friday of July 2007, [July 27, 2007] the secondary market for nonagency mortgage-backed securities returned, no bid. That was, if you will, the big earthquake that set off the ensuing financial tsunami.

Ex. 57, Deposition of Robert A. Garrett at 53. *See also* Mr. Garrett's trial testimony. Tr. 3/1/2012 at 21.

First Tennessee Bank was one of the institutional warehouse lenders that was defrauded. According to Taneja's Statement of Facts in his Plea Agreement, First Tennessee suffered a loss of $5,637,293 and all lenders and secondary mortgage purchasers lost more than $33 million.[3]   The trustee seeks to recover $3,958,022.14 from First Tennessee for advances made to FMI which were repaid by FMI.  The trustee asserts that the payments were fraudulent conveyances.  He asserts that the entire scheme was a Ponzi scheme.  In the alternative, he asserts that each transaction was made with the intention to hinder, delay or defraud FMI's creditors.  First Tennessee argues that the scheme was not a Ponzi scheme, that none of the transactions were fraudulent conveyances, and that it acted in good faith.

### The Fraudulent Scheme

Taneja founded FMI in the early 1990s.[4]  It successfully operated as an ordinary and legitimate mortgage brokerage for many years.  It took mortgage applications from individuals seeking to purchase a home or refinance the mortgage on their home and agreed, when approved, to make the loans.  In order to fund its loans, it entered into agreements with warehouse lenders which funded the loans until they were sold to a secondary mortgage purchaser.  In general, FMI obtained a purchaser for the loans it originated before the first payment was due.   This legitimate business was successful for a number of years.

---

[3]Ex. 52, Statement of Facts dated November 13, 2008, *United States v. Vijay K. Taneja,* Criminal Case No. 1:08 CR 421(E.D.Va.) at 7.

[4]The facts are drawn primarily from the Statement of Facts in Taneja's criminal case.  The trustee relied heavily on the Statement of Facts which he supplemented with the testimony of Robert Patrick, a fact witness who corroborated and expanded upon them.

Problems arose. FMI's warehouse lender in 1999 was Republic Bank. Starting in approximately 1999, FMI began making loans that it was unable to sell resulting in an increasing outstanding balance on Republic Bank's line of credit and the time loans were outstanding. Republic Bank stopped funding new mortgages.

FMI replaced Republic Bank with U.S. Bank. U.S. Bank extended a $15 million line of credit which it increased to $20 million. FMI was obligated to repay the advances on the line of credit within 90 days after the advance whether or not the loan was sold. Beginning in 2000 and continuing into 2001, in order to enrich itself and to pay its outstanding obligations, including those to Republic Bank, FMI began to submit fraudulent loans to U.S. Bank:

> The process of submitting phony loan documentation to U.S. Bank continued over time as defendant TANEJA created more recent bogus loans for the purpose of obtaining additional advances of cash that could then be used to pay down the line of credit for those previously submitted bogus loans, which, according to the warehouse lending agreement, had to be sold to an investor or otherwise repurchased by FMI within 90 days of their origination.

Ex. 52, Statement of Facts dated November 13, 2008 at 4 in *United States of America v. Vijay K. Taneja*, Criminal Case No. 1:08 CR 421(E.D.Va.).

In 2001, U.S. Bank discovered the fraudulent scheme and terminated its relationship with FMI. The unpaid loan advances of approximately $3.7 million were eventually paid by FMI. There is no evidence as to what happened between 2001 and 2007 with respect to warehouse lenders.

In April 2007 an employee from Regions, then FMI's warehouse lender, referred FMI to First Tennessee because Regions was getting out of the warehouse lending business.[5] In early July 2007, First Tennessee approved FMI's loan application and established a $15 million line of credit. It suspended the line of credit on October 26, 2007. The Statement of Facts states that First Tennessee

---

[5] Regions had made previous referrals to First Tennessee.

was defrauded out of $5,637,293.00 on advances for ten loans dated from September 11, 2007

through September 28, 2007, that were never repaid.  Ex. 52, Statement of Facts at 7, ¶18.  The

trustee seeks to recover nine payments from FMI to First Tennessee that paid off advances on the

line of credit and three payments of interest on outstanding advances.  The nine loans and three

payments are in the rightmost pair of columns and total $3,958,022.14.

| | Transfer from First Tennessee to Title Pro | | Transfer from TitlePro to FMI | | Transfer from FMI to First Tennessee Bank | |
|---|---|---|---|---|---|---|
| Loan No. | Date | Amount | Date | Amount | Date | Amount |
| 4594 | 08/17/07 | $412,830.00 | 08/24/07 | $412,830.00 | 09/26/07 | $415,996.82 |
| 4593 | 08/17/07 | $412,830.00 | No evidence of transfer | | 09/26/07 | $416,896.92 |
| 4591 | 08/17/07 | $237,600.00 | 08/24/07 | $237,600.00 | 09/27/07 | $239,468.25 |
| 4679 | 10/17/07 | $524,200.00 | No evidence of transfer | | 11/30/07 | $529,429.01 |
| 4303 | 09/06/07 | $610,000.00 | 09/10/07 | $607,325.52 | 11/30/07 | $620,749.00 |
| 4634 | 09/14/07 | $411,689.00 | 09/14/07 | $411,689.00 | 12/06/07 | $418,873.00 |
| 4329 | 09/25/07 | $316,800.00 | 09/25/07 | $316,800.00 | 12/06/07 | $321,538.00 |
| 114656 | 09/21/07 | $410,561.00 | 09/24/07 | $410,561.00 | 12/06/07 | $417,064.20 |
| 4648 | 09/17/07 | $370,600.00 | 09/17/07 | $370,600.00 | 12/06/07 | $376,696.94 |
| Multiple | | | | | 12/11/07 | $125,000.00 |
| Multiple | | | | | 02/06/08 | $50,000.00 |
| Multiple | | | | | 03/03/08 | $26,310.00 |
| | | | | | Total | $3,958,022.14 |

The first pair of columns after the loan number column are the advances from First Tennessee

to TitlePro, the settlement agency that closed the fraudulent loans.[6]  The second pair of columns are

the transfers of the loan proceeds from TitlePro to FMI.  The last pair of columns are the repayment

---

[6]TitlePro was an active participant in the fraud.  The fraudulent loans could not have been processed without
its participation.  This included transactions between TitlePro and the warehouse lenders and TitlePro transferring the
proceeds of the fraudulent loans to FMI.  Mr. Garrett testified about collusion between a mortgage broker and a title or
settlement agent:

> Q.  If a title agent -- I'm kind of getting side-tracked right here but it's about this case -- but if a title
> agent is complicit in an illicit scheme with one of your customers, what impact does that have on First
> Tennessee's ability to discover this illicit conduct?
> A.  When there's collusion it greatly impairs our ability.  We do rely on segregated interests.

Tr. 3/1/2012 at 44.

of the advances by FMI to First Tennessee.  Exhibits 4 - 50.  The last three transfers were interest payments on various loans outstanding on the line of credit.  There was no evidence for the counterpart transfers in the first two pairs of columns for these three payments.

The Statement of Facts states that Franklin Bank, another warehouse lender, was defrauded. It lists 19 advances on Franklin's line of credit for loans totaling $8,141,327 that were not sold or paid by FMI.  The dates of the loans are from November 14, 2007 through December 7, 2007.  The Statement of Facts also sets out 30 fraudulent loans sold to two secondary mortgage purchasers: 13 to Wells Fargo Bank and 17 to EMC Mortgage totaling $7,503,350 and $11,880,321, respectively. Ex. 52, Statement of Facts at 7, 10-11, ¶¶19, 26-27.

Robert Patrick was the trustee's principal witness.  His company was employed by the Unsecured Creditors Committee and the trustee to secure the financial records of the debtors and to investigate their financial affairs for the five-year period preceding the bankruptcy.  He testified that his company secured all of the records of FMI including all electronic information and more than 300 boxes of loan files.  In addition to FMI's records, the trustee subpoenaed all missing bank records.  There were more than 125 bank accounts.  Patrick's company recreated FMI's financial transactions for the five-year period preceding the bankruptcy.  There were more than 45,000 lines of data.  Tr. 2/29/2012 at 107-110.

The trustee's counsel asked Mr. Patrick where the money went.

Q.    Did .  .  . you investigate or review the purposes of the money that FMI had secured through this scheme, what they used it for?   Well, let me ask you a question:  did you look at that issue as to what the money that was obtained through the double-sale of notes and fraud described in paragraphs 16 and17 [of the Statement of Facts] with respect to First Tennessee and Franklin Bank was used for?

A.    Yes.

Q.      What was the money used for?

A.      The money was used to repay pre-existing debts created by Mr. Taneja through the scheme primarily.  In addition to those pre-existing debts he built a 22,000 square foot house and bought nice cars and enriched himself.

Q.      Did he also use some of this money to operate the business –

A.      Yes.

　　　.  .  .

Q.      Did he also use the money to pay the operating expenses of the business such as the rent, secretarial help?

　　　.  .  .

THE WITNESS:  The answer is yes, all of the entities he utilized these proceeds to fund business operations.

　　　.  .  .

Q.      Proportionally was it a major share of the money that he obtained from the fraudulent scheme, the payment of the normal operating expenses?

A.      No.

Tr. 2/29/2012 at 119-120.[7]

The Statement of Facts states:

From mid to late 2007 and into February 2008, in order to enrich FMI and to fund theatrical and movie productions of Elite Entertainment, Inc., another company owned by defendant TANEJA, the defendant TANEJA and PL conspired and agreed with each other to defraud First Tennessee Bank and Franklin Bank by having FMI submit fraudulent mortgage loan packages for the purpose of obtaining funds, drawn from each to the two warehouse lines of credit.

Ex. 52, Statement of Facts at 6, ¶15.

Mr. Patrick did not opine as to whether any of the nine First Tennessee notes in question were

fraudulent.  In answer to questions from the bank's attorney, he testified:

Q.      Forgive me if I asked you this already, you can't say definitively that the transfers to First Tennessee were done for the purpose of defrauding other creditors, can you?  You have no basis for saying that, do you?

A.      The transfers to First Tennessee were to continue the scheme and that the defrauding of the creditors is a legal theory that I'm not an attorney.

_____

[7]The 22,000 square-foot home Taneja was building for himself was on Summit Drive.  The Statement of Facts lists two loans – both dated January 25, 2007 – made to Taneja and secured by his Summit Drive home.  The notes were purchased by Wells Fargo Bank and EMC Mortgage for $2,950,000 and $2,897,921, respectively.

Q.    That's your opinion, correct?

A.    I'm a fact witness. I'm not entitled to an opinion.

On redirect, the trustee's counsel asked:

Q.    Mr. Patrick, you were not engaged to find opinions as to whether a note was a fraudulent note or not, correct?

A.    Correct.

Q.    Mr. Wilbon asked you about these transfers one through nine, or several of them.  Did the facts that you found relating to those transfers, were they consistent with the fraudulent scheme stated in the statement of facts?

A.    Yes.

Tr. 2/29/2012 at 149-151.


## Ponzi Schemes

The trustee argued that Taneja and FMI's fraudulent scheme was a Ponzi scheme.  The allegation is important.  Once a fraudulent scheme is shown to be a Ponzi scheme, a presumption arises that all of the transactions that are a part of the Ponzi scheme were made with the intention to hinder, delay, or defraud creditors, a critical element of a fraudulent conveyance.  The Ponzi scheme presumption relieves the trustee of the burden of proving that each transaction was made with the intention to hinder, delay, or defraud creditors.[8]  A party seeking to raise a presumption has

---

[8] *Merrill v. Abbott (In re Independent Clearing House Company),* 77 B.R. 843, 860 (D.Utah 1987) states:

One can infer an intent to defraud future undertakers from the mere fact that a debtor was running a Ponzi scheme.  Indeed, no other reasonable inference is possible.  A Ponzi scheme cannot work forever.  The investor pool is a limited resource and will eventually run dry.  The perpetrator must know that the scheme will eventually collapse as a result of the inability to attract new investors.  The perpetrator nevertheless makes payments to present investors, which, by definition, are meant to attract new investors He must know all along, from the very nature of his activities, that investors at the end of the line will lose their money.  Knowledge to a substantial certainty constitutes intent in the eyes of the law, *cf.* Restatement (Second of Torts §8A (1963 & 1964), and a debtor's knowledge that future investors will not be paid is sufficient to establish his actual intent to defraud them. *Cf. Coleman Am. Moving Servs., Inc. v. First Nat'l Bank & Trust Co. (In re American Properties, Inc.)* 14 B.R. 637, 643 (Bankr.D.Kan. 1981) (intentionally carrying out a transaction with full knowledge that its effect will be detrimental to creditors is sufficient for actual intent to hinder, delay or defraud

(continued...)

the burden of proving the predicate facts that give rise to the presumption.  In this case, the burden

is on the trustee to prove the predicate facts:  that a Ponzi scheme existed and that the transactions

were a part of the Ponzi scheme.  If the trustee cannot carry his burden of proof, the presumption will

not arise.[9]  *In re Whitley,* 463 B.R. 775, 781-83 (Bankr.M.D.N.C. 2012); *In re Pearlman,* 440 B.R.

569, 575 (Bankr.M.D.Fla. 2010); *Wing v. Williams,* 2011 WL 891121, *4 (Bankr.D.Utah 2011).  The

---

[8](...continued)
within the meaning of §548(a)(1)).

[9]Prior to trial, the question of whether the Ponzi presumption had already been established was before the court
and the court ruled that the presumption had not been yet established.  The trustee asserted that it was established during
argument before Judge Stephen S. Mitchell on the bank's motion for summary judgment.  The bank asserted in its
motion for summary judgment that the Ponzi presumption was not applicable in the case.  The trustee defended on the
ground that there were material facts genuinely in dispute.  (Docket Entries 26, 27 and 33).  The trustee did not file his
own motion for summary judgment or seek affirmative relief in response to the bank's motion.

    Judge Mitchell, who has since retired, heard the motion.  His order is simple and direct:  The motion was
denied.  (Docket Entry 38).  It granted no other relief.  The transcript of the oral ruling filed with the court does not
contain the argument that Judge Mitchell heard so there is no context other than the written pleadings to understand what
was said.  The oral ruling is explicit that Taneja's fraud was not a "classic Ponzi scheme" but seems to state that it shared
characteristics of one.  Judge Mitchell stated in his oral ruling:

    [W]hile I agree that it is not a classic Ponzi scheme, it certainly shares with any form of a classic
    Ponzi scheme.  This doesn't involve investors but it does involve like a check-kiting scheme, the
    payment of one debt with other fraudulent debts.

        So, I think that the trustee is entitled to the Ponzi presumption.  Of course, a presumption is
    just that.  A presumption can be rebutted; but I think the trustee has made out a sufficient case here
    to go forward..

        For all of those reasons, I'm going to deny the motion for summary judgment.  I'll prepare
    the order reflecting my ruling.

Tr. 7/15/2011 at 94-95 (Docket Entry 85-1).

    When presented with this issue before trial, this judge ruled that the Ponzi presumption was not yet established
because that determination was not contained in Judge Mitchell's written order.  The order denied the motion for
summary judgment, but did not go further and grant partial summary judgment to the trustee, relief that had not been
requested.  The ruling was based on the finding that there were material facts genuinely in dispute.  Those facts are not
articulated in the oral ruling.  From reviewing the written motions and the subsequent arguments, the court believes that
the predicate facts necessary to establish the Ponzi presumption were in dispute, including whether the facts asserted
were themselves sufficient.  Not having sought partial summary judgment on this issue and the order not addressing it,
the court ruled that the Ponzi presumption was not established during the argument of the summary judgment motion.

question becomes, what is a Ponzi scheme?  What predicate facts must be established before a Ponzi

presumption arises?

There is no single definition of what constitutes a Ponzi scheme.  *Black's Law Dictionary*

defines a Ponzi scheme as:

> A fraudulent investment scheme in which money contributed by later investors
> generates artificially high dividends for the original investors, whose example attracts
> even larger investments.  Money from the new investors is used directly to repay or
> pay interest to old investors, usu. without any operation of revenue-producing activity
> other than the continual raising of new funds.  This scheme takes its name from
> Charles Ponzi, who in the later 1920s was convicted for fraudulent schemes he
> conducted in Boston.

*Black's Law Dictionary* (7th ed. 1999) at 1180.

*In re Lake States Commodities, Inc.,* states that:

> In a Ponzi scheme, an enterprise makes payments to investors with monies received
> from newly attracted investors, rather than from profits of a legitimate business
> venture.  Generally, investors are promised large returns on their investments, and
> initial investors are in fact paid sizeable returns.  The fact of those payments helps
> to attract new investors, giving the impression that a legitimate business opportunity
> exists, even though there is no underlying business venture.  All the while, promoters
> draw off money from the scheme, often to finance lavish lifestyles.  Ultimately the
> scheme collapses, as more and more investors need to be attracted into the scheme
> so that the growing number of investors on top can get paid.  A Ponzi scheme cannot
> last forever because the investor pool is a limited resource that will eventually run
> dry.  See, e.g. *Jobin v. McKay (In re M & L Business Machine Co.),* 84 F.3d 1330,
> 1332 n. 1 (10th Cir. 1996) *("McKay"); Wyle v. C.H. Rider & Family (In re United
> Energy Corp.),* 944 F.2d 589, 590 n.1 (9th Cir. 1991); *Floyd v. Dunson (In re Ramirez
> Rodriguez),* 209 B.R. 424, 430-31 (Bankr.S.D.Tex. 1997); *Jobin v. Ripley (In re M
> & L Business Machine Co.),* 198 B.R. 800, 807 (D.Colo. 1996) *("Ripley"); Martino
> v. Edison Worldwide Capital (In re Randy),* 189 B.R. 425, 437 n. 17 (Bankr.N.D.Ill.
> 1995).

*In re Lake States Commodities, Inc.* 253 B.R. 866, 869 n.2 (Bankr.N.D.Ill. 2000).  *See also In re*

*Bonham*, 229 F.3d 750, 759 (9th Cir. 2000) ("Generically, a Ponzi scheme is a phony investment plan

in which monies paid by later investors are used to pay artificially high returns to the initial investors, with the goal of attracting more investors.")

The court in *Deangelis v. Rose (In re Rose)* 425 B.R. 145 (Bankr.M.D.Pa. 2010), also sought a definition of a Ponzi scheme.  It observed the difficulty of defining a Ponzi scheme.   "One of the struggles in this case has been to find a clear definition of the term 'Ponzi scheme.'"  *Id.* at 152.  It started with the *Black's Law Dictionary* definition and then quoted and discussed several cases.  The first case quoted was *In re C.F. Foods, L.P.,* 280 B.R. 103 (Bankr.E.D.Pa. 2002) which stated that a Ponzi scheme was:

> a fraudulent investment arrangement in which returns to investors are not obtained from any underlying business venture but are taken from monies received from new investors. Typically, investors are promised high rates of return and initial investors obtain a greater amount of money from the Ponzi scheme than those who join the Ponzi scheme later. As a result of the absence of sufficient, or any, assets able to generate funds necessary to pay the promised returns, the success of such a scheme guarantees its demise because the operator must attract more and more funds, which thereby creates a greater need for funds to pay previous investors, all of which ultimately causes the scheme to collapse. *In re C.F. Foods, L.P.,* 280 B.R. 103, 110 n.15 (Bankr.E.D.Pa. 2002) (citing *In re Taubman,* 160 B.R. 964, 978 (Bankr.S.D.Ohio 1993)).

*Rose* continued its discussion by quoting from *Agricultural Research and Technology Group, Inc,* in  which the Ninth Circuit defined a Ponzi scheme as:

> an arrangement whereby an enterprise makes payments to investors from the proceeds of a later investment rather than from profits of the underlying business venture, as the investors expected. The fraud consists of transferring proceeds received from the new investors to the previous investors, thereby giving other investors the impression that a legitimate profit making business opportunity exists, where in fact no such opportunity exists.  *In re Agricultural Research and Technology Group Inc.,* 916 F.2d 528, 531 (9th Cir.1990).

The final case *Rose* quoted was *In re Canyon Systems Corp.* There the Bankruptcy Court set out the following factors for determining the existence of a Ponzi scheme:

> (1) deposits were made by investors; (2) the Debtor conducted little or no legitimate business operations as represented to investors, (3) the purported business operations of the Debtor produced little or no profits or earnings; and (4) the source of payments to investors was from cash infused by new investors. *In re Canyon Systems Corp.,* 343 B.R. 615, 630 (Bankr.S.D.Ohio 2006) (citing *In re Lake States Commodities, Inc.,* 272 B.R. 233, 242 (Bankr.N.D.Ill. 2002)).

*Rose* opined that, "The differences among the various definitions complicate the determination of whether a Ponzi scheme was operated by Rose." *In re Rose,* 425 B.R. 145, 153.

As the *Rose* discussion and the cases quoted make clear, there is no single definition of a Ponzi scheme. However, there are characteristics that occur repeatedly. The first and foremost characteristic is a fraudulent investment scheme in which money contributed by later investors is used to pay artificially high dividends to the original investors creating an illusion of profitability and thereby attracting new investors. The company appears to be profitable, but both the business and the profits are mirages. There is no business. There are no profits. The return to the investors is not a result of the success of the underlying business venture, but is taken from the new investors. There is an ever increasing need for new investors to perpetuate the fraud. Without new investors, the fraud will come to an end, not necessarily through the discovery the fraud but because of the necessity of new victims cannot be met. The fraudulent venture is unable to support itself. There is a mathematical impossibility of continuing the fraud indefinitely, which is contrary to the impression given to the investors that the business venture will continue profitably for the indefinite future.

In a Ponzi scheme, there is no legitimate business venture. The purpose of the venture is to perpetrate and perpetuate a fraud. The ostensible transactions are bogus. False books and records are maintained. False financial statements are created. There are false communications with investors and the public. The aura of a legitimate, well-founded business masks the fact that there is no business, just a fraud.

Legitimate income from the legitimate portion of the business, if any, is insignificant. The need for additional funding is to pay prior investors a return on their investments, not to fund a legitimate business enterprise. There are unrealistic rates of return to investors. They exceed market rates and are an inducement to the public to invest. They often appear to be "too good to be true" and, in fact, are.

One of the justifications for invoking the Ponzi presumption is equity. In a Ponzi scheme, the early investors are repaid their investment with an unreasonable profit. By the time the scheme fails, they have their money and their profit and have left the scene. The most recent investors relied on the same representations and the satisfaction of the early investors but are left holding the bag. All of the investors are similarly motivated. All of them were subject to the same fraud and fraudulent misrepresentations. The only distinguishing factor is that some were first and others were last. Early investors are preferred by the fortuity of timing. They unwittingly furthered the fraud by appearing to be satisfied investors. In these circumstances, it is equitable that all similarly situated victims be treated the same. That is, that the early investors disgorge their investments to the extent repaid and their profits to a common pot which is shared pro rata among all victims.

In this case, the trustee has not sustained his burden of proving that there was a Ponzi scheme. While there was a significant fraud perpetrated on warehouse lenders and secondary market

purchasers, that is not sufficient to prove that there was a Ponzi scheme.  All Ponzi schemes are

frauds.  Not all frauds are Ponzi schemes.

Ponzi schemes characteristically have high rates of return – typically unrealistically high rates

of return – that are artificial.   There were no high rates of return in this case.  Nor were they

artificial.  All transactions between FMI and First Tennessee were at market interest rates.  The

interest rates were arms-length rates arrived through ordinary commercial negotiations.  There was

no evidence that any of the interest rates were high, let alone extraordinarily high.  There was no

evidence that any were outside the then-prevailing market range of rates.  The draws on the lines of

credit were not occasioned by investors seeking to get part of a "good deal."  They were made to FMI

in the ordinary course of the financial affairs of First Tennessee in accordance with ordinary

commercial terms.  The trustee offered no evidence that this was different with respect to any other

warehouse lender or any secondary mortgage purchaser.

There was a legitimate business venture.  FMI was and had been a legitimate mortgage broker

for more than a decade before it collapsed.  There is no evidence that all or most or even a high

percentage of the mortgages made were fraudulent.  To the contrary, the evidence shows that FMI

continued to operate as a legitimate mortgage broker to the vast number of borrowers who applied

to it for loans.  It is true that there were many loans that were fraudulent, but the existence of some

or many fraudulent loans out of a much larger universe of legitimate loans does not make the

business venture an illegitimate or illegal venture.  Mr. Patrick testified that his company secured

more than 300 boxes of loan files that were present at FMI's office.  Each box undoubtedly

contained more than one loan file, probably in the range of five to ten.  That would mean that there

were 1,500 to 3,000 loan files recovered.  The Statement of Facts identifies 68 fraudulent loans.

14

While there were undoubtedly more that were not identified in the Statement of Facts, the inference drawn from the evidence presented is that the overwhelming number of loans made were legitimate.[10]  The Statement of Facts states that the total loss was more than $33 million.  It was undoubtedly more.  This is a significant loss, but not particularly significant in comparison to the likely total amount of loans made by FMI.  The average loss per loan identified in the Statement of Facts was about $485,000.  If FMI made 1,500 loans that also averaged $485,000, the total loan volume was $727,500,000.  While both estimates – the number of loans and the loan volume – measure the same thing, the fair inference is that the overwhelming business of FMI was legitimate notwithstanding that there were fraudulent transactions.  In a Ponzi scheme the underlying venture is not legitimate.  To the extent that there is a legitimate business venture, it is a veneer masking a fraud.

Moreover, neither the warehouse lenders nor the secondary mortgage purchasers were investing in FMI.  None benefitted from the success of FMI or shared in any of its profits.  In a Ponzi scheme, the investors look to the success of the purported business.  In this case, that would be the success of FMI and the profits generated from its activities.  Neither the warehouse lenders  nor the secondary mortgage purchasers bought FMI-originated mortgages intending to share in FMI's operating profits.  They looked solely to the mortgages generated – some of which turned out to be fakes.

Another characteristic of a Ponzi scheme is an ever increasing number of investors, all of whom are being duped.  An ever larger number of subsequent investors is necessary to keep the

---

[10]The scheme relied on legitimate loans.  Information was taken from legitimate loan closings to create fraudulent loan documents.  Ex. 52, Statement of Facts at 6, ¶16.  Duplicate notes were created and sold as the sole legitimate loan.  *Id.* at 10, ¶25.

illicit venture going.  The evidence does not support the conclusion that there was an ever increasing

number of warehouse lenders.  It appears that the number of warehouse lenders remained more or

less the same over time although the actual warehouse lenders changed over time.  The evidence

shows that Republic Bank was a warehouse lender in 1999.  It was replaced by U.S. Bank.  It is not

clear who the warehouse lender was between U.S. Bank and Regions in 2007 or whether there was

more than one.  First Tennessee replaced Regions in July 2007.  Franklin Bank became FMI's

warehouse lender in October 2007.  Ex. 52, Statement of Facts, at 6, ¶14.  The evidence does not

show that there was an increasing number of warehouse lenders, only that they were more or less

sequentially replaced over time.

There is no evidence that the number of defrauded secondary mortgage purchasers continued

to increase over time.  In fact, there is no evidence as to the number involved at any given time or

the number defrauded over the course of the fraudulent scheme.

There is no evidence or analysis of the fraudulent loans themselves.  In a Ponzi scheme, the

amount of money involved in the fraud continually increases as the number of investors expands,

principally to satisfy the expectations of the current investors.  While a lot of money was involved

in this fraud there is no evidence that it grew to support the fraud itself.  The evidence as to the use

of the fraudulently obtained money was that it was used to build a mansion for Taneja and to invest

in his entertainment business.  It was not used to pay high rates of return or to constantly pay older

investors in an effort to give the appearance of a successful business.  In this fraud, once the

fraudulent loan was purchased, there were limited circumstances in which the principal needed to

be repaid in a single payment.  The essential element of the fraud was to service the outstanding debt.

The mortgages themselves were expected to be long-term obligations.  If they were repaid in a single

16

payment, they were more likely repaid for the benefit of Taneja, that is, to "refinance" a fraudulent

loan with a new one at a lower interest rate. This simply reduced Taneja's costs to operate the fraud.

The essence of the fraud was the creation of duplicate loans: the original was legitimate; the

duplicate, fraudulent. The deed of trust securing the original legitimate loan was recorded in the

ordinary course but no deed of trust was recorded for the fraudulent duplicate. Fake deeds of trusts

and recorders' receipts were created to make it appear, first to the warehouse lender and then to the

secondary mortgage purchaser, as if the fraudulent duplicate note was also secured by a recorded

deed of trust. *See* Tr. 3/1/2012 at 68. If this practice was consistently followed, the fraudulent loan

would not appear on a title report when the homeowner sold or refinanced his mortgage. *See,* Ex.

52, Statement of Facts, ¶25. Taneja simply continued to make the monthly payments. The difficulty

with the trustee's evidence is that it simply does not address this aspect of the fraudulent scheme.

There is insufficient evidence to show that this scheme operated in the same fashion as a Ponzi

scheme.

The transactions in this case appear to be more akin to a check kiting scheme than a Ponzi

scheme. The first three payments to First Tennessee that the trustee seeks to recover were made on

September 26 and 27, 2007. They total $1,072,361.90. FMI received $1,019,014.52 from TitlePro

on September 10, 2007 and September 14, 2007. FMI received an additional $1,097,961.00 before

it made the three payments to First Tennessee on September 26 and 27, 2007. There are no advances

on the Franklin Bank line of credit shown on the Statement of Facts before November 14, 2007.

Based on this evidence, it is clear that the money used to repay First Tennessee on September 26

and 27, 2007, did not come from Franklin Bank. It came from First Tennessee itself from the new

fraudulent loans that it funded from September 6, 2007 through September 25, 2007. The trustee

17

showed no other source of funds during this period. What it means is that FMI was creating new fraudulent loans with First Tennessee to pay back fraudulent loans to First Tennessee that FMI was unable to sell. This is the same pattern identified in the Statement of Facts with respect to U.S. Bank in 2001. Ex. 52, Statement of Facts dated November 13, 2008 at 4 ("The process of submitting phony loan documentation to U.S. Bank continued . . . TANEJA created more recent bogus loans . . . to pay down the line of credit for those previously submitted bogus loans"). This is much closer to a check kiting scheme than a Ponzi scheme. Only First Tennessee was involved in this check kiting scheme.

The payments made to First Tennessee on November 30, 2007 and December 6, 2007 most likely came from Franklin Bank. The Statement of Facts shows several advances on its line of credit prior to the November 30, 2007 and December 6, 2007 payments which would be sufficient to make those payments. There is no evidence of other lenders and Mr. Patrick testified that there was not enough loan business to generate funds sufficient to make those payments. These transactions also look more like a check kiting scheme than a Ponzi scheme. It is true that there was another party involved and that its money paid First Tennessee, the prior lender. While this is a characteristic of a Ponzi scheme, it has more in common with a check kiting scheme where the thief is replacing one bank with another. Only First Tennessee and Franklin were involved in this check kiting scheme.

An important element noticeably missing is the appropriateness of the equitable nature of the relief afforded in a Ponzi scheme. In a Ponzi scheme, all victims are treated the same. Those who got their money out fund the pot which is then distributed to all victims proportionately. In the check kiting involving only First Tennessee, that remedy is inappropriate. First Tennessee was the only one injured when FMI paid off an advance for a fraudulent loan outstanding on First Tennessee's

18

line of credit  with a new advance for a new fraudulent loan on the same line of credit.   Nothing

changed.   The amount outstanding remained the same.   There was still one fraudulent loan

outstanding on the line of credit.  It is inappropriate to require First Tennessee to now disgorge the

payment for the first fraudulent loan, a payment that – after a round about trip – originated from First

Tennessee itself, and then distribute the disgorged payment to all of Taneja's creditors.   Nor is it

appropriate to require First Tennessee to disgorge a payment that originated from Franklin and

distribute it to all of Taneja's creditors.   The sole injured party in that transaction is Franklin.

Additional considerations making the application of the Ponzi equitable remedy inappropriate are

that most of the loan transactions were legitimate and cannot be recovered and that the trustee does

not seek to recover payments from the secondary mortgage purchasers who bought fraudulent loans

and whose money was used to payoff the warehouse lender's lines of credit.   He did not seek

recovery of these payments presumably because the payments came from third parties – the

secondary mortgage purchasers – and were not property of Taneja or FMI, the debtors.

While there is no uniform definition of a Ponzi scheme, the court concludes that the

characteristics of this fraud are not sufficient to classify it as a Ponzi scheme.  There was a legitimate

business venture that included fraud, but the business venture itself was not fraudulent.   The

operation of the business venture – FMI – did not depend upon the fraud.   It was self-supporting.

It did not require additional frauds to keep it alive.   There were no unusual rates of return.   The

transactions were made in accordance with ordinary business terms.  The rationale for imposing the

Ponzi scheme equitable relief is substantially absent.  There were a number of fraudulent transactions

and First Tennessee suffered a significant loss as a result of the frauds, but having failed to prove the

predicate for the Ponzi presumption, the Ponzi presumption will not come into effect.   The trustee

must prove the elements of a fraudulent conveyance as to each transfer that he alleges is a fraudulent conveyance.

Fraudulent Intent

The trustee does not lose his case because he cannot establish the Ponzi scheme presumption. He simply has to prove that each transaction that he seeks to recover is itself a fraudulent conveyance, that is, that the debtor made each transfer with the intent to hinder, delay or defraud its creditors. The intent necessary is in the disjunctive. An intent to hinder or an intent to delay is sufficient. *In re Summit Place, LLC,* 298 B.R. 62, 70 (Bankr.W.D.N.C. 2002).

The resolution of this issue is not necessary to this case because First Tennessee successfully proved its good faith defense. Assuming, *arguendo,* that the trustee could establish that some or all of the transactions were fraudulent conveyances, the bank's good faith defense would prevail. Nonetheless, the parties raised several issues relating to fraudulent transactions that warrant comment.

The bank emphasized that each transaction was required by the terms of the loan agreement. FMI was, in fact, required to repay each advance within 90 days after the advance. The risk of finding a secondary mortgage purchaser who would purchase a loan – presumably a legitimate loan – was on FMI. If it was unable to do so, it was required to repay the advance. In order to assure that FMI could do this, the bank examined FMI's financial circumstances when it approved the line of credit and was satisfied that FMI could repurchase its notes if a secondary mortgage purchaser did not buy them. While it is true that each transaction that the trustee seeks to avoid was, in fact, required by the bank's loan documents, this does not immunize the transaction from the trustee's

20

fraudulent conveyance attack.  The intent to hinder, delay or defraud creditors is rarely expressed and is frequently ascertained from the surrounding facts and circumstances, one of which may be contractual obligations to make the transfer.  The fact that there are legitimate reasons for a transfer is relevant and is considered in determining whether there was an intent to hinder, delay or defraud creditors, but existence of a legitimate reason is not necessarily determinative.

The trustee emphasized that the money used to make each of the transfers he sought to avoid came from a draw on a warehouse line of credit based on a new fraudulent loan.  Accepting, *arguendo,* that FMI perpetrated a new fraud to obtain the money to pay First Tennessee, the character of the source of the money does not determine the character of the use of the money.  The transaction in issue is the transfer to First Tennessee, not the transaction that was the source of the funds to make the transfer to First Tennessee.  The transfers to First Tennessee may be avoided if they were made with the requisite intent.  The source of the funds is a relevant consideration in determining intent, but is not determinative.

While it is possible to conclude from the systematic nature of the fraud that the payments in question were made to perpetrate the fraud, to conceal it, or to hinder or delay its discovery, the conclusion must be reached in light of all of the evidence and is not inevitable.  The evidence also showed that Taneja had successfully avoided detection for years; that prior warehouse lenders who had terminated his line of credit with an outstanding balance had not detected the fraud; and that the bursting of the real estate bubble with the concomitant change in the real estate lending market was the precipitating cause of Taneja's demise.  One might conclude that FMI and Taneja had no intent to hinder or delay creditors in making the contractually due payments to First Tennessee, even though that may have been the effect.

<u>Good Faith Defense</u>

The United States District Court for the Eastern District of Virginia recently succinctly set out the standard for the good faith defense under 11 U.S.C. §550(b). It stated:

> A transferee has an affirmative defense to a recovery if the transferee took the conveyance at issue "for value, . . . in good faith, and without knowledge of the voidability of the transfer avoided." 11 U.S.C. § 550(b). "'[A] defendant claiming a defense to liability under § 550(b) bears the burden of pro[ving]'" that it has satisfied the elements of the defense in 11 U.S.C. § 550(b). *In re Nieves,* 648 F.3d 232, 237 (4th Cir. 2011) (quoting *Tavenner v. Smoot (In re Smoot),* 265 B.R. 128, 140 (Bankr.E.D.Va. 1999). In this Circuit, "'knowledge' includes only actual notice,'" *Nieves,* 648 F.3d at 237 (quoting *Smith v. Mixon,* 788 F.2d 229, 232 (4th Cir. 198)), and "actual notice" means only that the transferee "'knew facts that would lead a reasonable person to believe that the property transferred was recoverable.'" *In re Nordic Village, Inc.,* 915 F.2d 1049, 1055 (6th Cir. 1990) (quoting *Mixon,* 788 F.2d at 232 n.2). Additionally, an objective good faith standard applies to the defense provided by 11 U.S.C. § 550(b). The Fourth Circuit has explained that "good faith" under 11 U.S.C. §550(b) "contains both subjective ('honesty in fact') and objective ('observance of reasonable commercial standards') components." *In re Nieves,* 648 F.3d at 239. "Under the subjective prong, a court looks to 'the honesty' and 'state of mind' of the party acquiring the property. Under the objective prong, a party acts without good faith by failing to abide by routine business practices." *Id.* (citations omitted).

*Gold v. Gateway Bank, FSB (In re Taneja),* Case No. 12-264-AJT, (E.D.Va. July 3, 2012) at 2-3.

First Tennessee bore the burden of proof on its good faith defense. It relied principally on the testimony of Robert A. Garrett, its Executive Vice President responsible for the bank's mortgage warehouse lending. He has been with First Tennessee for fourteen years and has been in banking for 29 years. He started the mortgage warehouse groups in three lending institutions: a thrift, a private company and First Tennessee. At First Tennessee he is responsible for all aspects of the mortgage warehouse lending function. Three groups – a business development group, an operations group and a risk control group – work under his direction. As a part of his work at the thrift, the private company and First Tennessee, he developed and continues to own software used by First

Tennessee and others in managing and operating their warehouse lending departments. It is a database management system and user interface that is used to gather data, process collateral transactions, track collateral transactions, process monetary transactions, and provide management reporting. He was largely responsible for developing and revising the bank's policies and procedures relating to mortgage warehouse lending and coordinating them with the other departments of the bank. The bank's counsel inquired about his knowledge of the mortgage warehouse lending industry, continuing education and his efforts to stay on top of mortgage warehouse lending.

> Q.    [D]o you do anything to stay abreast of or knowledgeable of what's going on in the industry in terms of the mortgage warehouse lending industry, that is, in terms of what kind of software is being used with respect to the customers at mortgage warehouse lenders and what kind of policies and procedures are in place?
>
> A.    Yes, I do. I, frankly a large part of my job, I monitor industry publications, I watch various headlines, I receive e-mail, I don't want to call them newspapers but the equivalent of e-mail newspapers every day.
>
> Q.    E-letter type documents or something like that?
>
> A.    Yeah, there will be things with hyperlinks that will take you out to websites and it's generally a compilation of items of interest for people in our industry who might want to click on the link. It might take me to the Wall Street Journal or to the Mortgage Bankers Association publication or a Fannie Mae publication so it could be anything but it's, I rely on several sources to give me up to date everyday kind of information.
>
> Q.    Now what about continuing education? Are there any seminars that you ever attend annually, biannually, or anything of that nature, on the mortgage warehouse lending industry?
>
> A.    Not really on warehouse. We do have a warehouse lenders roundtable. To be honest with you, I don't go to seminars as much anymore. I'm more likely to speak at one of these events or to participate with other speakers at these events.
>
> Q.    So you've kind of reached that point to where you're more of a panelist more, called upon?
>
> A.    I would say so.

Tr. 3/1/2012 at 8-9.

Mr. Garrett testified generally to practices and policies in the mortgage warehouse industry; to the state of the industry from July 2007 through April 2008; and to First Tennessee's practices and policies, its relationship with FMI, and its transactions with FMI. His testimony was knowledgeable and credible. The bank did not seek to qualify him as an expert witness.

Mr. Garrett presented the process by which FMI came to First Tennessee, its loan application, the steps taken to process the loan application and the approval of the warehouse lending line of credit. Throughout the process appropriate information was requested, gathered, verified and evaluated. There were no negative reports that should have raised red flags. The referral came from another warehouse lender that was closing its warehouse lending department and trying to place its good customers with other warehouse lenders. It was not a situation where one warehouse lender was trying to quietly get rid of a bad apple.

There were difficulties in the early months of the relationship concerning compliance with documentation standards, that is, certain documents were late. The documents were provided. Mr. Garrett and Benjamin G. Daugherty, III, the Senior Vice President and Relationship Manager who was responsible for the FMI account, testified that the discrepancies did not reflect suspicious or fraudulent conduct, but rather were part of learning what First Tennessee required and part of the normal process of new accounts.[11]  Tr. 3/1/2012 at 48.

FMI first drew on the bank's mortgage warehouse line of credit in July 2007. The line was suspended on October 26, 2007, and never reinstated. Although FMI had not exceeded the approved line of credit limit, the account was suspended because there were too many loans outstanding too

---

[11]Mr. Daugherty also testified that he was familiar with "the ways of the industry in general." Tr. 3/1/2012 at 141.

long.  They were "dragging" on the line, that is, the loans were not being purchased quickly enough

by secondary mortgage purchasers.  Tr. 3/2/2012 at 165.  While this was certainly a concern for the

bank, it was not seen as suspicious or an indication of fraud.  On July 27, 2007, the nonagency

secondary mortgage bond returned a "no-bid."  Both Mr. Garrett and Mr. Daughtery attributed the

drag on the line of credit to the secondary mortgage market itself.  Mr. Garrett explained, "[T]he

market in 2007 was continuing to be in turmoil and so there's, you get the market dynamics that are

going on out there that makes the loans less marketable."  *Id.*  The bank, Taneja and the mortgage

industry expected the change in market conditions to be temporary and the "normal" market to return

within a relatively short period.  They were wrong.  It never did.

Appropriate action was taken to correct the late document issue as well as the lengthening

time mortgages remained outstanding on the line of credit.  On November 1, 2007, Mr. Garrett and

Mr. Daughtery visited Taneja at his office in Virginia.  They discussed the issues and impressed

upon Taneja the need to sell the loans and clear the line of credit.  Taneja explained that part of the

problem had been that a loan processor had left for a vacation and did not return, requiring him to

replace her.  The trustee asserts that the explanation was improbable and was a red flag.[12]  While the

explanation was unusual, Mr. Garrett and Mr. Daughtery spoke with Taneja in person, observed him

and his office, and – importantly – conducted other investigations.[13]  The trustee offered no evidence

---

[12]The trustee asserts that stringing out delivery of loan documents necessary to complete a sale of the loan was part of the fraud or at least an indication or a red flag that there was a fraud in process.  Here, though, the success of the fraud depended not on stretching out the process, but by getting the fraudulent loans sold.  The sooner they were sold to unsuspecting secondary mortgage purchasers and taken off First Tennessee's books, the better.  The likelihood of detection and the cost in additional interest expense were both reduced.

[13]They contacted Wells Fargo, one of FMI's secondary mortgage purchasers, and reviewed the outstanding loans.  Wells Fargo – from whom First Tennessee later discovered Taneja and FMI's fraud when Wells Fargo sued Taneja and FMI for fraud in April 2008 – was ready to purchase the loans when the loan packages were completed.  Tr. 3/1/2012 at 132 - 134.

25

that the explanation was false.  Nor is there any evidence – or reason to believe – that further investigation of the missing loan processor would have unraveled Taneja's fraud.

As the new year came, there were still loans outstanding on the line of credit.  No new advances had been made.  Mr. Garrett and Mr. Daughtery again traveled to Virginia.  This time the meeting while not unpleasant was less cordial.  They were kept waiting when they arrived.  Taneja's lawyer was present. The bank's objective was to get the line of credit paid off.  They reasonably felt that the longer that the outstanding loans remained unsold, the less valuable they became.  As they lost value, FMI – and Taneja as guarantor – would need to liquidate other assets to pay the shortfall. Tr. 3/1/2012 at 122, 124.  Taneja did not want to sell the loans in the then-existing market, he said, because he felt that the market was only temporarily depressed and he did not want to take the loss at that time.  If the market rebounded, which he and many others thought would happen, he would mitigate his loss significantly.  Tr. 3/1/2012 at 164.

Mr. Garrett and Taneja reached a workout agreement.  The principal term was that Taneja would provide additional collateral.  Taneja gave them a list of properties purportedly standing as collateral for other loans and agreed to give the bank a security interest in those loans.  Mr. Garrett and Mr. Daughtery drove around the area looking at the properties and satisfying themselves of the value of the collateral.  Tr. 3/1/2012 at 63, 132.  They returned to Tennessee and recommended the workout be approved.  The bank approved the workout and efforts began to document it.  Tr. 3/1/2012 at 63 - 64.  One element of due diligence was to verify that the proffered loans were secured by the properties as represented by Taneja.  In mid-April 2008, Mr. Garrett was advised by

the bank's attorneys that the proffered loans were not secured as represented.  Tr. 3/1/2012 at 68.[14]

Within days, Mr. Garrett found out that Wells Fargo had sued FMI, alleging fraud.  The relationship

ended.  Tr. 3/1/2012 at 130.

There is no credible evidence that First Tennessee had any actual knowledge that anything

was wrong before the title report was received in April 2008.  All of their actions were consistent

with one who was unaware of the existence of a fraud.  The bank took care in its underwriting

decision in extending the line of credit.  The underwriting process revealed no adverse information

that required further investigation.  All of the advances on the line of credit were made within four

months.  During this period documents were delivered late, but the issues were not the kind that raise

red flags.  The deficiencies were cured.  After the November 1, 2007 meeting with Taneja, Mr.

Garrett contacted Wells Fargo, a secondary market purchaser, to find out why the loans were not

being sold more rapidly.  He was assured that there was nothing wrong with them, that Wells Fargo

would buy the loans but that the loan packages were not complete.  Tr. 3/1/2012 at 132 - 34.[15]

---

[14]On direct examination, Mr. Garrett testified:

A.  Mid-April 2008 and we were contacted and told that the recording, the recorder's information on the original security instruments was incorrect, apparently falsified, and that it was, that it looked good.  It was our understanding that it looked good but it was not valid, not correct.

Q.  Now is this the first time that First Tennessee ever had reason to believe that there was something false or fraudulent going on with Taneja and FMI?

A.  Yes.

Tr. 3/1/2012 at 68.

[15]Mr. Garrett testified as follows:

Q.  At the time of the November 1st meeting, just moving back in time a little bit following your discussion with him First Tennessee didn't do any investigation or looking into the bona fide nature of any of the loans that would have been on the pipeline, correct?
A.  Following my –
Q.  The November meeting.

(continued...)

On October 26, 2007, the line was temporarily suspended because the loans were outstanding too long. This was a concern of the bank but did not indicate fraud. Mr. Garrett took action appropriate to the circumstances. He looked into the matter and met with Taneja at Taneja's office. Some loans were paid after the meeting. The situation was explained by the turmoil in the market. In fact, that explanation was probably correct. Taneja's fraud depended upon selling the fraudulent loans, not holding onto them. Had the secondary market not collapsed, no one would have been the wiser. The music would have played on.

The trustee points to various items and asserts that they were red flags that should have put the bank on notice of a problem. One was that payments for the loans were coming from FMI, not

[15](...continued)

A. Okay, following my November meeting we didn't do what?

Q. Do any investigation into whether the loans that were sitting on the pipeline were bona fide good loans?

A. That's not correct.

Q. Did you talk to a contact at Wells Fargo?

A. Yes.

Q. Was that the extent of your investigation?

A. Well, investigation wasn't, it wasn't the extent of what gave us comfort that he was dealing in good faith. Loans were continuing to be bought off of his pipeline and there was really no reason whatsoever to suspect anything other than he was dealing in good faith.

Q. I understand your rationale but the question I asked was whether you did or did not do anything other than contact Wells Fargo?

A. We checked the story against the evidence at hand and it made sense and it was consistent with the information that we got from Wells Fargo and the investigation that we did with Wells Fargo and. *[sic]*

Q. The investigation with Wells Fargo you described as asking whether they were still going to buy loans. Is that what your investigation consisted of?

A. They're still going to buy loans?

Q. If they're going to purchase loans from FMI.

A. It went a little deeper than that. It was a lot deeper than that actually. We went through the loans, the specific loans that were on his pipeline. We wanted to know what they looked like, what the issues were, what they were missing. We're talking about more than these 10 loans, of course, at the time. I don't remember the number of them but, and they went through record and told us, we need this, we need this, we need this.

Q. The missing documents of Wells Fargo that were needed in order to purchase loans, is that what you're talking about?

A. Right. And that, by the way is very common, very consistent with what we're dealing with, with all other investors and all other customers.

Tr. 3/1/2012 at 132 - 34.

secondary mortgage purchasers. This is true. But it is also true that this was FMI's obligation when

a loan was not purchased within the requisite time period. The trustee's witness, Robert Patrick,

testified paying advances on the line of credit from FMI's operating account did not mean that the

payment was fraudulent. Tr. 2/29/2012 at 142 - 43.[16] Part of the bank's underwriting process was

to assure that FMI and Taneja had sufficient resources to make such purchases. Tr. 3/1/2012 at 33.

Moreover, the bank did investigate the matter. Mr. Garrett and Mr. Daughtery went to Virginia to

address the problem with Taneja. They were satisfied with the results of the meeting. The problems

discussed were not unique to FMI but were throughout the industry.[17]

---

[16]The bank's counsel inquired of Mr. Patrick:

Q. FMI was obligated to repay the debt to First Tennessee pursuant to the warehouse agreement, correct?
A. Yes.
Q. And the fact that FMI transferred money from its operating account to repay that debt, standing alone is not an indication of fraud necessarily, now is it?
A. You've got a lot of qualifiers in there but FMI repaid First Tennessee the money that it repaid First Tennessee.
Q. And the fact that it came from its operating account does not mean that these loans are fraudulent in and of itself, does it?
A. It could mean a number of things.
Q. I want you to answer my question. Does it, standing alone the fact that the funds came from an operating and repaid the lender, that does not mean it's fraudulent? You can answer that question yes or no.
A. The answer to that is yes, it does not mean that it's fraudulent.

Tr. 2/29/2012 at 143.

[17]On cross-examination, Mr. Garrett testified:

Was this a particularly problematic situation? I would have to say there were others that were equally problematic at the time under the circumstances.
                                                                    .   .   .
Q. So you considered it problematic but not serious; is that what you're saying?

A. I considered it to be problematic within the reasonable range of other things that we were dealing with at the time. As I described before, he has $12 million worth of loans that we expect are impaired to the tune of somewhere between 50 and 70 percent. We also know how much liquidity he had when we underwrote him and we feel like he's at a point where he needs to show that he can get some loans sold for near market value before we extend any additional funds to him.

Tr. 3/1/2012 at 109 - 111.

(continued...)

[17](...continued)
On direct examination, Mr. Garrett testified:

THE WITNESS: So in the last Friday of July in 2007 the secondary market for non-agency mortgage-backed securities came back no bid. What that means is, if you owned a mortgage-backed security you didn't have a market on which to sell it.  It would be like owning a stock on the New York Stock Exchange and the New York Stock Exchange ceasing to exist. There was no exchange. That caused all of the SMPs [secondary mortgage purchasers] to begin constricting their underwriting criteria, making them tighter meaning they didn't immediately cease making alt A loans but they would tighten their criteria and whenever they did that they would issue deadlines by which you needed to get loans to them in order to get them purchased under the old criteria.  That happened repeatedly from early August of '07 through really into '08 at which time those loans just don't exist anymore other than through private label lenders who would keep them on their own balance sheet.

BY MR. WILBON:

Q.   Now First Tennessee was not an SMP but was a warehouse lender. Did the, I'll use the term "meltdown" you just described, impact your business or First Tennessee's business?
A.  Yes, it did. I do want to point out that First Tennessee, as an institution was an SMP but not in any way connected to my group or what I do for a living.  It did affect my group and it affected my group because we had approximately, we had between $200 and $300 million in loans that were being held as collateral.  They were considered to be in our pipeline at that time and probably 50 percent or so of those loans fell into the alt A category, meaning that it was very imperative to us to work with our customers to get those loans delivered on a timely basis because we knew that underwriting standards were tightening and we knew that every time they did there was a timing issue.  Timeliness was ever more critical at that point than it had ever been before.
Q.  Why was timeliness so critical at that point?
A.  Well, if you originated an alt A loan and the next day the investor tightened their underwriting criteria, as a lender you would have maybe two weeks to get it to them, maybe three weeks, maybe a month but they would say, get the loan to us by such-and-such date and we'll buy the loan but after that if it's not delivered by that date we won't buy the loan.
Q.  Was that causing you to put more pressure on your customers then?
A.  Probably I would say more pressure. It caused the, we always put the pressure on our customers to move the loans through quickly. Timing is always important but yes, it was ever more important to us and to our customers then more so than it had ever been before.
Q.  What impact was this having on some of what I'll call your long-standing customers that had been doing business with you for years?
A.  Some of them went out of business. Some of them, it really didn't matter how long they'd been in business or for the most part even how much money they had.  It mattered what kind of loans they were originating, how crisp their execution was and by that I mean how good they were at building a loan file, getting a loan file delivered, and getting it bought.  If they were crisp in their execution and conservative in their underwriting they do well. If they were not they were, they ended up with loans on their balance sheet that they could not sell and typically my customers don't have the, it's not the business they're in.  They don't want to sit there and own loans. They want to own, originate them, and sell them.
Q.  But in this time period we're talking about now, 2007, you had customers aside from FMI who were having to keep loans on their balance sheet
A. Oh, yeah.
Q.  They were repaying First Tennessee and keeping the loans?
A.  Yes.

(continued...)

The trustee points to the second meeting with Taneja. While Taneja was out of the room, Taneja's attorney told Mr. Garrett that the bank did not want the notes in question. Mr. Garrett immediately asked whether the notes were fraudulent. Taneja's attorney denied this assertion. Mr. Garrett concluded that what Taneja's attorney meant was that they were of significantly impaired value and that other collateral would be more valuable to the bank. The trustee argues that the attorney's statement was a red flag pointing to fraud and that Mr. Garrett recognized it as such.

There are problems with the trustee's position. First, the meeting was on January 30, 2008, after all of the payments, except two interest payments totaling $86,310 were made. Even if the trustee was correct, it would affect only the last two payments. There is no evidence that would relate this knowledge back to an earlier date. Mr. Garrett's quick questioning shows that he was alert to the possibility of fraud in the industry and was following up when appropriate. In the context, the attorney's reply was properly accepted. They were trying to work out the problem of the unpaid advances on the line of credit. One issue was the value of the notes. This issue was not new. It had been raised at the November 1, 2007, meeting. Mr. Garrett testified that at that time, Taneja had "$12 million worth of loans that we expect[ed] [were] impaired to the tune of somewhere between 50 and 70 percent." *Id.* at 111.

The burden of proof on the good faith defense is on the bank. In this case, the bank's witnesses, Mr. Garrett and Mr. Daughtery, were knowledgeable in the bank's practices, the bank's relationship with FMI, the transactions in issue and the mortgage warehouse industry. Their

---

[17](...continued)
Tr. 3/1/2012 at 23-25.

testimony was credible that at the time of each transfer, the bank did not have any actual knowledge

of the fraud Taneja was perpetrating on it and others, did not have any information that would

reasonably have led it to investigate further, and the bank's actions were in accord with the bank's

and the industry's usual practices.  The trustee did not present any evidence that contradicted or

significantly challenged the bank's evidence.[18]

The last argument that the trustee makes is that the bank can only prevail on its good faith

defense if it presents an expert witness who can opine as to industry practices and standards and

whether First Tennessee acted in accordance with them.  These elements are a matter of proof and

may be proven in any appropriate manner.  An expert witness is not necessary to establish industry

standards or to establish that the bank acted in accordance with them.  In this case, the bank's

witnesses were knowledgeable and well experienced.  Their testimony was sufficient to establish the

necessary elements.  The court is aware that they are bank employees and were responsible for both

the mortgage warehouse operations and the transactions with FMI.  The court considered these

factors and the extent to which they may have affected the witnesses credibility.  They do not,

however, disqualify them as witnesses.

## Conclusion

While Taneja perpetrated a significant fraud through his company, FMI, the fraud was not

a Ponzi scheme and the Ponzi presumption does not arise.  In any event, the bank is entitled to the

good faith defense of 11 U.S.C. §548(c).  The complaint will be dismissed.

---

[18]The trustee introduced a report addressing fraud in the mortgage industry and identifying various methods by which frauds are perpetrated, including indicators of frauds.  While the court considered it and found it interesting, it does not determine the outcome of this case.

Alexandria, Virginia
July 30, 2012

/s/  Robert  G.  Mayer
Robert G. Mayer
United States Bankruptcy Judge

Copy electronically to:

Bradford F. Englander
Christopher A. Jones
Justin Fasano
Michael P. Falzone
Sheila G. de la Cruz

17704